Bower, we're ready when you are. Yes, may it please the court, I'm Carolyn Bower, I was appointed on appeal to represent Eric Giles and his co-defendant and co-appellant Kyle Corzine is represented by Mr. Ullman, who was also here. This is a consolidated appeal and it has to do with various conspiracies to sell and regulation requirements that have to do with deposits from the proceeds of drug transactions. I will concede at first that my very first argument was wrong. I believe that the government was correct in using Bruton to evaluate the co-defendant's confession and he is correct about that. However, the text messages, excuse me, the text messages which were admitted as co-conspirator statements under rule of evidence 801, the court did make a mistake in evaluating those and the standard that went into it. The standard that he should have used, the I relied heavily on this court's decision in Borgelli and that court said that the preponderance of evidence standard ensures that before admitting evidence, the court will have found it more likely than not that the technical issues and the policy concerns addressed by the federal rules of evidence have been afforded due consideration. The court erred. The court said, and I'll give you the whole quote on that, but the court said there was sufficient evidence and the other mistake the court did was explaining why the court used the standard of sufficient evidence because the court said the evidence was that the conspiracy existed and the quote came from page, and to be perfectly honest with the court, I did not catch this quote until I was preparing this argument, so it's not, I don't believe it's in the brief, but on page 909 of the joint appendix, the court says, I think there is sufficient evidence in the that the conspiracy that began in 07 continued past August 08 and that the time period of 09 was a time period in which a jury could conclude that a conspiracy existed and that the messages were during that conspiracy and furtherance of it. And so what's your submission? What's wrong with that? That he used, instead of using a preponderance of the evidence, he said there was sufficient evidence and then he went on to say that a jury could conclude that a conspiracy existed. Doesn't that amount to a finding by the trial court that there is sufficient evidence the jury could conclude by beyond a reasonable doubt which is the only way a jury can decide anything in a criminal case and therefore isn't that, doesn't that include a preponderance? Well, no, not according to Boeshele, and I hope I'm saying that correctly. You did mention Boeshele, but you know there's no code about, you have to mention that we're certifying a case on point. It says here that the court said evidence is placed before a jury when it satisfies the technical requirements of the determinations. The inquiry made by a court concerned with these matters is not whether the preponderance of the evidence wins or loses his case on the merits, but whether the evidentiary rules have been satisfied. So what the court should have said was instead of, oh, well, you know, a jury could find this, what the court should have been doing was evaluating the evidence and deciding whether or not any evidence that was presented meets any rules of evidence and any policy concerns for that. And this gets very confusing. This got very confusing to me because I think, well, how can a court do that? I'm still not sure specifically what was wrong, what you're saying was wrong with what the district court said at JA 909. It seemed to me to have hit both pros of Boeshele. Well, not necessarily because that decision said that the court needs to use a preponderance of the evidence, not sufficient, but preponderance of the evidence. And when the court says that magic word, preponderance of the evidence, that means the court has gone through, evaluated the evidence, made sure that the rules of evidence have been complied with and all policy concerns. And the court is not to be looking at whether or not what a jury would decide later. Isn't that precisely what the inquiry is before the testimony can come in? And that is that the court has to decide there is a preponderance of the evidence that the jury would consider that would permit a finding later on of a conspiracy beyond a reasonable doubt in order for it to come in. And then what he did in this instance was find, he just went beyond that and found that there's sufficient evidence that a jury could find beyond a reasonable doubt. Well, it's like he did take that extra step, but what bothers me is that how do we know that? How do we know that by not saying preponderance of the evidence, by saying sufficient as opposed to preponderance, that the court did not realize that what he had to do was to evaluate whether or not the rules of evidence had been complied with and those policies. What would be the, what's the harm here? Wasn't there a fair amount of evidence of a conspiracy quite apart from the text messages? And I'm assuming that you're still alleging error in the context of those text messages. The harm is that, and we're going to be seeing it more and more and more and more, text messages are like a transcript of someone's life. People who text a whole lot tend to everything, text, text, text. And it's like you have a report from a court reporter of everything that person has done. Now, these text messages, I believe there was 9,900. They didn't admit all of them because a lot of them just had to do with just Mr. Giles' life, what he was going about. But when Mr. Giles was arrested, he consented to the downloading of, consented to law enforcement having his phone and downloading those messages and going over them. I don't think he realized that forensically they could go in and get everything. He got a text. The eagle has landed, meaning the drugs were there. That conversation has ended. Delete the text. He had no idea that that's still there. What's the point there? And such as that. I say I'm running out of time, but with the text messages, as I said, it's going to be more important because this information is so incriminating, and it has to show that it's been legally obtained. Now, this court, this circuit. Actually, I think maybe you can reformulate this answer, unless one of my colleagues has another question. I probably could. And I think you reserved some time for rebuttal. So in those two minutes, maybe you can just crystallize your best argument. I will do that, Your Honor. Thank you. Okay. Thank you. If you please, the court. My name is Weedy Long. I'm from Asheville, North Carolina. I represent Kyle Forsey. I would agree with Ms. Fowler with respect to the admission of the party component of my brief, which is argument four. We would withdraw that. What I would like to do first is address issue number three, the denial of a motion to suppress, together with issue one, that being the denial of a motion to continue. On October 29, 2009, agents arrived at my client's home in Charlotte with the intent to question him, according to them. We have an interrogation component there. According to my client, he asked for a warrant, but they did not produce one. He asked them to leave. They did not leave because they smelled marijuana, and he was detained as a result of that. He claims that he asked for an attorney. Repeatedly, the agents claimed that he did not. They did admit they had no warrant. They did admit he was detained both outside from reentering his residence and also inside his residence at the base of the stairs while they were searching the upstairs room of a person who also resided there, Ms. Grist, Ms. Angelica Grist. The reason for the motion to continue, which is obviously related to the suppression issue, is because the attorney was retained a mere 11 days before trial. She did not subpoena Ms. Grist because Ms. Grist had informed her she would be available. Ms. Grist did not come to court. The government contends that my client did not use due diligence by subpoenaing her, but my client was informed she would be there. What is our standard of review? Standard of review is abuse of discretion with respect to this. But again, with regard to the motion to suppress, Your Honor, it would be- Well, you're going to another argument now. Yes, sir. Yes, ma'am. I'm sorry. I'm trying to incorporate both components. To both. Right. OK. Well, maybe talk about the- Why is it important? Ms. Grist wasn't there. This court, or the trial court, concluded the ruling, the findings of fact, the conclusions of the law were based on credibility of Mr. Corsi. If Ms. Grist had been there, she may very well have corroborated some of what he said happened that particular day. Don't you have to make a showing of what you would have said in order for that argument to have ledge? Your Honor, you're correct, but there was no opportunity to make an offer of proof because the motion to continue was denied. That's where the discretion comes into play. I'm not aware of any- Well, the court denied it, couldn't you say? And I'd like to put this on the record. If she was called, this is what she testified to. If she had known exactly what was going to be said, that's correct. Well, but that goes to Judge Payne's point. If you don't know what she's going to say, how can you make any offer of proof about it? Judge Payne, if she had been given more than 11 days, Your Honor, she might have gotten her there. So there's where the discretion comes into play. I'm not aware of any case where that's been held to be a reasonable time for preparation. Well, the lawyer had talked with Ms. Grist according to what you said earlier because Ms. Grist had agreed to come. So at the time that the continuance motion was denied, the lawyer knew what Ms. Grist was going to say and could have said that to the court but did not, so that's where we are. That's correct. If I may point out, however, that irrespective of that, with regard to the motion to suppress, we contend that Mr. Corsi was under the functional equivalent of custody at the time because You would have a better argument but for some Fourth Circuit cases. Well, the cases that the government cited, Your Honor, Parker was a situation where the defendant was not aware of what was going on. She was in an upstairs bedroom while her grandmother was being handcuffed and at gunpoint brought into the home. Mr. Corsi was a part and parcel of everything that happened in this case. The Hargrove case was also cited, but that was a search warrant case. A search warrant didn't exist. In our case, no warrant existed. Could I ask how do you address the fact that Agent Morgan testified on cross-examination over the government's objection about the telephone conversation he had with Grist who appeared to confirm some of Mr. Corsi's statements? Yes, Your Honor, that is correct. My recollection of that testimony was that he did speak with her approximately a week before trial and she did indicate that Mr. Corsi had told her that he would get a lawyer for them. I don't know in what context that conversation was communicated. It wasn't a verbatim transcript of the phone conversation in the record. So I'm not sure how that could have played out. If Ms. Grist had been there, she could have shed some light on that as well. I would also point out in response to Justice Matsa's comment to begin with, the Frankson case, which was also cited by the government, is clearly distinguishable because that is a case as to whether or not Miranda warnings were adequately given. In this case, there was no Miranda. We clearly had interrogation. In our opinion, on behalf of my client, I would submit that he did not feel like he was free to leave. The agent thought he had been smoking marijuana. Apparently, he had been. He thought he was going to be arrested for that. He was not allowed to reenter his home. And then when he finally was able to, he was stopped at the bottom of the stairs. And he agreed to communicate based on the fact that they showed him a picture of his girlfriend and he was concerned for Ms. Grist's arrest. Ms. Grist, again, could have shed some light on that. If I may, with all due respect, move on to the motion to sever while I have some time remaining, we feel like that is probably our most important issue in this case. And again, that is a discretionary standard. There were 93 packages that were received. Only one was tied to my client's residence, which was not flagged, which was not put under surveillance. Numerous deposits were made. Only two were linked to my client. The co-defendant, Mr. Giles, is clearly the ringleader. Anyone who's read the record in this case would know that. And he was tied to possession of a .22 rifle, a .38 handgun, and a 9mm Ruger when there were two different domestic disturbance violence calls to his home. Under what circumstances have we granted motions to sever or overturned one? Well, Your Honor, I cited Katakos, I believe. I think I put it in in there in the brief, and I apologize. We consider that as a case where it's a U.S. Supreme Court case. It's more akin to our fact situation than the case that was cited by the state, by the government. In Myers, there was an arrest warrant for the lessee of the apartment. There were three people in the apartment. But it doesn't matter for purposes of the motion to sever. It is an abusive discretion standard. You start from the fact that there's a strong presumption in favor of joint trials, and it doesn't matter necessarily whether one person is more culpable than the others. Only if there's a serious risk that it would compromise a specific trial right or prevent the jury from making a reliable judgment. Yes, Your Honor. And we give considerable weight to the fact, to circumstances in which limiting instructions are given. So given the sort of stringency of that standard. Yes. That's the reason I went back to Categos, which I believe is a 1946-47 case, U.S. Supreme Court. I'm sorry. The situation in that case was we had a ringleader, just like we have a ringleader here, being tried with numerous co-defendants for a single conspiracy. And they did not deal specifically with each other. They dealt with the ringleader, which was the case here for the most part in any event. The court in that case said that markedly different degrees of credibility does play a role, is a fact to be considered in the granting or denial of a measure. But the facts in Cahillacas, as I recall, were that case involved the joinder of a number of various unrelated defendants who didn't know one another. That's true. And that doesn't seem to be the case. In this case, some co-defendants knew each other, I believe, and some did not. But of course it's these two. These two knew each other. Yes, ma'am. These two did definitely know each other. But again, we would submit that the right to fair trial very well could have been compromised because there's an old adage, you run with the pack, you share in the kill. My client was hobbling at best. He was a minor player compared to Mr. Giles, and he was tried with Mr. Giles, and the jury heard all the bad things, bad acts, bad character of Mr. Giles, and lumped that together, guilt by association, I think, did play a role. I would add very quickly, with respect to our insufficiency of evidence argument, that hinges clearly on your Honor's determination of motion to suppress, as well as the text message argument that is made by Ms. Bell. Thank you very much. Thank you. Mr. Miller? May it please the Court. My name is William Miller on behalf of the United States. There have been a number of alleged errors stemming from the trial rights in this case. A review of the record shows that none of those alleged errors have merit. Well, there are two less than we started out with. That's right. That's right, Judge Duncan. I'll begin my argument with the ruling on Mr. Corsi's motion to suppress, unless your Honors prefer otherwise. As Judge Moss indicated earlier, this issue is largely governed by prior precedents of this Court, particularly the Hargrove case. The facts of Hargrove are analogous to the facts presented here. On October 26th, the statements that the defendant made, the challenge statements, were made in his kitchen with two officers present. He was told he was not under arrest. He was not placed in handcuffs. And as Hargrove instructs, any prior restraints on his movement do not implicate whether or not he was in custody during that subsequent conversation. Was he held outside the house and then allowed to come in the house? Yes, Judge Bain, that's correct. How long does the record show he was held outside the house? My understanding is the entire encounter took approximately 45 minutes and that the interview was about 25 or 35 minutes of that. So the time he was outside couldn't have been more than 5 or 10 minutes. And the reason that the officers testified that they kept him outside was because they smelled marijuana when the door was open, and so in order to protect that evidence, they kept Mr. Corsi outside so that he couldn't go in and destroy the evidence based on the probable cause that they had. But then he voluntarily came into the house, right? Mr. Corsi was allowed to enter the house voluntarily when his roommate consented to the search of her room. And then he was actually... And did he call up that he was going to man up? That's correct, Judge Mons. Yes, he was actually the one who initiated the conversation in the kitchen and selected the kitchen as the location for the statements. And so based on this court's precedent, he was not in custody at the time those statements were made. There was also an argument that perhaps the statements were involuntary based on the photograph of his girlfriend that was shown, or the questioning of the roommate. Neither of those incidents, based on the facts found by the district court, would rise to the level of overcoming his free will or rendering those statements involuntary. The photograph was actually shown to Mr. Corsi towards the end of the interview, and as Agent Morgan testified at that point, that Mr. Corsi was minimizing his responsibility. So it wasn't the case that Agent Morgan came in with the photograph and used it as a threat or a tool to overcome voluntariness in the statements. Would you mind addressing the argument that Ms. Bower made about the text messages in Bargelli? I'm not entirely sure I've mastered that. Yes, Judge Duggan. My understanding of the argument is that the incorrect standard was applied. I didn't hear anything from Ms. Bower that the wrong ruling was reached or that there was an incorrect ruling. So in order to find that Judge Conrad used the incorrect standard, you'd almost have to assume that when he says that the evidence was sufficient, that he had the wrong standard in his head or that he was somehow misapprehending what the law was. I think based on his statements, it's clear that he properly applied the test for Rule 801 D2E, which was to find first that there was a conspiracy. He specifically found as much on page 909 of the joint appendix. And also these statements were during and in furtherance of that conspiracy, which they clearly were. These were text messages about shipments that had arrived, all in disgusting marijuana. If we were to disagree with you, what would the consequence be of our agreement with respect to Mr. Giles on that point? What consequences would ensue? My understanding is that the claim just solely relates to the standard that the judge was finding and not to the accuracy of the ruling. I think a review of the record clearly shows that that ruling was correct. And so even if we were to assume that Judge Conrad was misapprehending the standard, the fact is he came out with the right ruling, and so therefore he didn't act outside of his discretion and there was no error brought before the trial because the text messages to that were admitted or properly admitted. I'll touch briefly on the issue of the motion to sever. As Your Honors have pointed out, this is an issue that's reviewed for abuse of discretion. There's a general principle that defendants that are indicted together are tried together. That's especially true in cases alleging conspiracy like this one. I believe the case law says that motions to sever are rarely granted in that context, and the two grounds relied upon by Mr. Corsi, spillover evidence or the fact that he was less culpable, have specifically found not to be sufficient to justify severance. And his claim also fails because he has to show actual prejudice at this point in the proceedings to show that the district acted outside of his discretion. If there's no further questions, the government would rest on its briefs and ask that the defendant's sentences and convictions be approved. Any questions? Ms. Bower, you have two minutes. Yes, Your Honor. What I'm hearing is the right ruling but the wrong standard, and in a way that's saying the court by accident came up with the correct ruling. Okay, but what are you saying? What I am saying is text messages, in this case, but statements by non-testifying co-conspirators are extremely incriminating. Therefore what? It needs to show on record that the court used the correct standard, preponderance of evidence, made the correct considerations under that. Now, this circuit does not have any ruling saying a court has to make findings of fact or a court has to have a specialized hearing to do this. So we do not know how this is going to be done any differently. My problem is, and I speak only for myself, and I'm addressing your argument, is that what if the court had just said, I overrule your objection, it's admitted. And then it comes up here. It seems to me you don't have any argument about standard. You just say the court didn't articulate a standard. But you'd have to argue whether the evidence was properly admitted or not. That's where the foul is. That's what the problem is about. You're entitled to a fair trial, not a perfect trial. Your Honor, I understand all this, but what I'm saying is when you have something that's so extremely incriminating as text messages, the court has to make sure it follows every step. In this case, the court did not. That's why I'm simply asking that the court reverse this decision  Thank you, Your Honor. Thank you. Just briefly, Your Honors, our position as a reasonable person in Mr. Corsi's position would have felt like they were in custody and not free to leave, not just because of the marijuana issue, but because he was detained outside and he was again detained inside at the bottom of the stairs while the agents were searching his home upstairs. But then doesn't he say, I want a man up here, give you a story, they go to his kitchen? I mean, you just line it up with all of our precedents. I understand that, but that came thereafter. And again, he did not give any statements with regards to the deposits until after he was shown a picture of his girlfriend. And again, according to him, the reason that he did that is because he wanted to stop anything from happening to Ms. Grist. He wanted to tell them what he knew at that point based on what had happened previously. I think it's all tied together. But how does that relate to the fact that he was restrained improperly? I'm sorry, Your Honor. I don't think showing him a picture of his girlfriend goes to whether he was improperly restrained, do you? Not as to whether he was improperly restrained. That happened after the fact. That happened after he was sitting at the kitchen table. That's when the picture was shown. I agree with that. However, he had previously been put in the position that he was in, and as a product of that conduct, he acted the way he did. And as stated with respect to the November 3rd statements, which I did not mention earlier, those were a product of what he said on the 26th, so they're all part and parcel of the same. And I don't see how there was any intervening event that changes the aspect of the original custody. So we again contend that— Well, on November the 3rd, he'd been given a Miranda warning. Not by the officer who he gave the statement to, allegedly by previous officers. But our argument with respect to those statements is tied with the previous day, the encounter on the 26th. Again, with regard to the actual prejudice on a motion to sever, if I were doing this on a post-conviction basis, I would be interviewing jurors and I would be asking them what, if any, impacted the testimony, the bad act testimony, the bad character testimony on the part of Mr. Giles. I'm not in that position, but circumstances do indicate that the credibility of my client was impacted significantly by the lack of credibility on the part of the co-defendant. Thank you very much. Thank you, Your Honor. I will ask our clerk to adjourn court, and then we'll come down and greet the lawyers. I understand that you were court appointed, is that correct? Yes, that is correct. We very much appreciate your efforts. We couldn't do these cases without you. Thank you very much. Thank you. This honor of the court stands adjourned until tomorrow morning at 8.30. Godspeed, United States. This honor of the court.
judges: Diana Gribbon Motz, Diana Gribbon Motz, Allyson K. Duncan, Allyson K. Duncan, Arenda Wright Alle